Richard C. NEEL, III, Appellant,

v.

David C. WALDROP, Sr., Eugene C. Griffith, William F. Partridge, Jr., Bankers Trust of South Carolina, Palmetto Production Credit Association, Appellees.

No. 79–1460.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1980.

Decided Jan. 30, 1981.

---

Daniel A. Carrell, Richmond, Va. (James E. Farnham, William F. Young, Hunton & Williams, Richmond, Va., Brian L. Boger, Cromer & Craig, Columbia, S. C., on brief) for appellant.

Thomas H. Pope, Newberry, S. C. (Thomas H. Pope, III, Pope & Schumpert, Newberry, S. C., William K. Charles, Jr., Charles & Charles, Greenwood, S. C., Charles Porter, McNair, Glenn, Konduros, Corley, Singletary, Porter & Dibble, Columbia, S. C., Howard L. Burns, Burns, McDonald, Bradford, Erwin & Patrick, Greenwood, S. C., on brief) for appellees.

Before WIDENER and SPROUSE, Circuit Judges, and HADEN, District Judge.*

WIDENER, Circuit Judge:

Richard C. Neel, III, the plaintiff, appeals the grant of summary judgment in favor of certain of the defendants in an antitrust action which he filed in the United States District Court for the District of South Carolina. Neel, a dairy farmer in Newberry County, South Carolina, filed his suit against nine defendants, claiming, among other things, that they had conspired to deprive him of credit and thus force him out of the dairy business. Summary judgment was granted as to all nine defendants on all counts. In this appeal, Neel challenges that order as to five of the defendants, David C. Waldrop, Sr. (Waldrop), a dairy farmer and milk hauler in Newberry County, who served as Chairman of the Board of Directors of Palmetto Production Credit Association and on the Newberry Advisory Committee of Bankers Trust of South Carolina; Palmetto Production Credit Association (PPCA), a federally chartered credit association having a branch office in Newberry County; Eugene C. Griffith (Griffith), a Newberry attorney who had represented Neel for several years; William F. Partridge, Jr. (Partridge), a Newberry attorney who served as State court receiver of Neel's property; and Bankers Trust of South Carolina (Bankers Trust), a state wide full-service bank with a branch office in Newberry County. He appeals only as to a claimed violation of § 1 of the Sherman Act, 15 U.S.C. § 1, a refusal to deal. See, generally, Sullivan, *Antitrust* (1977), p. 229–261.

Neel's complaint was filed in January 1978 and was answered by defendants in February and March. In June of that year, after very limited discovery, five of the defendants moved for summary judgment. The remaining defendants filed motions for summary judgment by August. Thereupon, Neel sought to depose the president of one of the defendant corporations. Some of the defendants moved to quash the motion to take the deposition on the ground that the local rules of court required discovery to be completed within 90 days after joinder of issues.[1] Defendants moved to close discovery, while Neel sought to extend discovery. Those motions remained pending for almost a year with no further discovery taking place. The court then denied plaintiff's motion to extend the discovery period and granted defendants' motions for summary judgment.

Neel claims that there were issues of material fact regarding an alleged conspiracy by the defendants to deprive him of his line of credit and thus force him out of business. We agree with plaintiff that there are genuine issues of material fact as to Bankers Trust, PPCA, and Waldrop, and that summary judgment was inappropriate as to those defendants. However, we affirm the order of the district court as to Griffith and Partridge.

As we have stated, the only claim before us is one of a refusal to deal in violation of § 1 of the Sherman Act.[2] Since the appeal is from a grant of summary judgment, we must look at the record in the light most favorable to Neel. *Poller v. Columbia Broadcasting Sys. Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). We emphasize that no question of whether Neel has stated a claim upon which relief can be granted is before us.

Neel was a dairy farmer in South Carolina, having gone into business with his fa-

---

* United States District Court for the Southern District of West Virginia, sitting by designation.

1. Local Rule of Court titled "In the Matter of Pre-Trial Discovery" provides in part that: "It Is Ordered that pre-trial discovery in all civil cases filed in this Court be completed within a period of ninety days following the joinder of issues, ..."

2. § 1 of the Sherman Act, 15 U.S.C. § 1 provides in part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: ...."

ther in 1963 after graduating from college. At that time they operated approximately 360 acres of land and milked about 50 cows. By 1974 Neel had expanded his operation to 1900 acres and over 1000 cows. In addition, he grew grain to feed his cattle, selling the excess, grew some cash crops, and raised and sold beef cattle. Neel sold his milk to Sealtest Milk Company for processing. Waldrop was a competitor of Neel in that he (Waldrop) also had a dairy farm nearby which was used for producing milk and beef and for growing and selling feed and seed.

Neel claims that the five defendants conspired to drive him out of business by depriving him of credit. In June 1974, Neel had a line of credit of $250,000 with Bankers Trust, which had extended him credit for operating expenses almost since he started in the farming business. Such line of credit was apparently secured by Neel's chattel inventory. On June 12, 1974, Neel borrowed $880,000 from Equitable Life Assurance Society to purchase land in neighboring Greenwood County and to consolidate his existing real estate mortgages. Equitable took a mortgage on Neel's realty. That same month Bankers Trust loaned Neel $101,000, putting him a little over his $250,000 limit on his line of credit. By September 1974, things had changed, however. Bankers Trust cut off Neel's line of credit, and refused to renew any of the notes composing the line of credit. Neel knew of nothing that caused such action by the bank, especially since it had loaned him the $101,000 three months before. During this time Neel's credit was good and he had no problems with Bankers Trust.

After Bankers Trust cut off his credit, Neel contacted his attorney, Griffith, about obtaining credit elsewhere. Neel at this point was seeking a $500,000 loan to consolidate all of his chattel loans and to provide new funds. Griffith recommended PPCA. Griffith then called Waldrop by telephone with Neel listening on an extension. Waldrop agreed to help Neel obtain the loan. Before Neel made formal application for the loan, three PPCA representatives, including one Suggs, President and Secretary/Treasurer of PPCA, came to Neel's farm to inspect his operations and the chattels which would serve as collateral, since PPCA's security interest was to be in chattels, with a second mortgage on the realty. Neel infers that they came at Waldrop's request since he had not made a formal loan application at that time. One of the representatives complimented Neel on how well he was doing and what a fine operation he had. Neel's loan, however, was not approved. The PPCA contends that a loan analysis from Federal Intermediate Credit Bank showed that the loan was not a sound one and that PPCA's security interest would be subordinate to Equitable's. The loan analysis is not part of the record. Neel claims that PPCA's reason could not be true since PPCA would have had an adequate security interest in chattels.

Neel then reapplied for a loan for a smaller amount, $250,000, from PPCA. He talked to the Farmers Home Administration about the loan and understood that they would guarantee the $250,000 PPCA loan. Neel also called Waldrop about the loan. Waldrop came to Neel's farm to discuss this loan application, stating that he could help Neel get his loan if Neel would stop growing his own feed and buy feed instead from Central Soya of Newberry (Waldrop was a corporate officer of Central Soya of Newberry and a stockholder in its parent corporation); shift his milk from Sealtest to Pet for processing so that Waldrop could haul it; and refrain from renting an additional tract of land between their two farms. Neel agreed to the conditions in order to secure the loan. Waldrop then told Neel the loan would be made. Waldrop next contacted Suggs from PPCA and told him, with Neel present, that Neel was cooperative and therefore to go ahead with work on the loan. Neel then thought his loan would be approved, and in fact stated that Waldrop told him he (Waldrop) felt sure it would be made by December 15. Instead, the loan application was turned down on December 15. Because Neel was unable to obtain financing elsewhere, he was forced into receivership when Bankers Trust foreclosed.

Griffith, Neel's attorney, filed no objection to the receivership and was appointed attorney for the receiver; the latter fact was not made known to Neel for several months. Partridge, an associate in the law firm that represented Bankers Trust, was appointed receiver. As receiver, Partridge mishandled the assets and sold them for far less than their value.

We first consider defendants Partridge and Griffith. We find no genuine issues of material fact relating these two defendants to a conspiracy of refusal to extend credit and thus eliminate Neel from his farming business.

■ Partridge's only role is that he was the receiver in the State court proceedings. Neel claims that as receiver Partridge let the assets deteriorate and sold them for less than their real value. No motion was filed in the State court proceeding regarding the receiver's discharge, however, as could have been done. And, under South Carolina law, Neel could not even bring a collateral action in a State court, but instead would have to return in the receivership proceeding to the court handling the receivership. *Stone v. Mincey*, 180 S.C. 317, 185 S.E. 619 (1936). Neel is estopped here from challenging the actions of Partridge as receiver when those very same acts were resolved in the State court proceeding. *Azalea Drive-In Theatre, Inc. v. Hanft*, 540 F.2d 713 (4th Cir.), cert. den. 430 U.S. 941, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1976); *Abramson v. Pennwood Investment Corp.*, 392 F.2d 759 (2d Cir. 1968). We note that Neel has presented us with no additional facts from which we could reasonably infer that Partridge was part of a conspiracy to withhold credit, relying wholly on the claim that Partridge sold the assets for far less than market value.

■ Griffith's only involvement in the conspiracy charged was his action as attorney for Partridge and his role in sending Neel to talk to Waldrop. Neel also complains that Griffith did not object to the receivership, and that he (Neel) did not

know for some time that Griffith was representing the receiver. Whether any of these actions may give rise to an action in the State court we do not consider,[3] but they do not violate the antitrust laws. As we have already noted, Neel's credit had already been cut off by the time of the first act with which Griffith is charged. There is nothing in the record from which we can reasonably infer that Griffith did more than get Neel and Waldrop together, which is not enough, even coupled with the other acts charged to Griffith, from which to infer participation in a conspiracy. Accordingly, we affirm as to Partridge and Griffith.

■ We do, however, find genuine issues of material fact as to the other three defendants. The district court found that there was a genuine issue as to Waldrop, and this finding is acknowledged to be correct by the defendants. Having eliminated all other defendants, however, the district court concluded that Waldrop could not conspire with himself and thus granted summary judgment as to Waldrop also.

In considering whether Bankers Trust and PPCA should be kept in the case, we have considered the rule in *Poller* that "... summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles...." 368 U.S. at 473, 82 S.Ct. at 491. Because the role of a court of appeals in fact finding is, and should be, quite limited, we consider principally the reasons given by the district court for its entry of summary judgment in favor of Bankers Trust and PPCA.

Several officers of Bankers Trust filed affidavits, considerable parts of which were conclusory in nature. They denied the bank's role in any conspiracy, and were largely, as the district court pointed out, assertions that the bank made its decisions with respect to Neel "solely as good banking practices require." The affidavits did state that Waldrop had no role in decisions

---

**3.** We are told in appellant's brief that Neel obtained a verdict against Griffith in a State court for malpractice in connection with the receivership. Whether there is a final judgment on that verdict is not shown.

concerning extensions of credit, and one of them gives as the reason for the bank's foreclosure that it was protecting itself as result of Neel's deteriorated financial condition.

What the bank's affidavits do not show, however, is as remarkable as what they do show. We must remember that according to Neel's testimony, which we must accept at this point at face value, he was in good financial condition in June of 1974, which was corroborated and evidenced by the fact of the $880,000[4] Equitable loan and the $101,000 Bankers Trust loan made in that month. Between June and September, according to the bank, then, Neel's financial condition deteriorated to the extent that the bank called his notes. The bank's affidavits do not show what facts it had learned between June and September to form the conclusion in September that Neel's credit was bad, while in June it must have been good. Neither did Neel have any warning from the bank that it was not going to renew his notes. We also note that none of the affidavits from the officials of the bank include any statement that the affiant is the person who called the notes. While two of them, Tindall and Sherard, did state that they participated in the management and handling of Neel's loans, the omission of any statement as to who called the notes is remarkable. Perhaps it is explained by the fact that Sherard's affidavit (he was a Regional Executive Vice President of the bank) shows that lines of credit as large as Neel's were not approved locally but were handled by a central credit committee in Columbia. If that is true, then the absence of an affidavit from the central credit committee is just as remarkable. To paraphrase *First National Bank v. Cities Service*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968), we do not think the bank's affidavits conclusively show that the facts upon which Neel relies to support his allegations are not susceptible to the interpretation which he seeks to give them. Absent any explanation from an official handling Neel's busi-

ness as to what the good banking practice was which required calling the notes, or how Neel's financial condition had deteriorated in the space of three months, and absent any explanation from the credit committee of the bank as to why it called Neel's notes, or whether it had any communication with the other defendants, we think that the inferences which Neel seeks to draw from the completely unexplained cancellation of his credit by the bank have not necessarily been overcome.

As the district court implied, the case against Palmetto Production Credit Association is stronger than it is against the bank. There is direct evidence that Waldrop and PPCA discussed such a loan to Neel, providing Neel would purchase certain goods and services from Waldrop and otherwise refrain in some ways from competition with Waldrop. The district court correctly noted that PPCA's failure to follow through on its substantial interest in making a loan to Neel may be considered evidence of participation in a boycott. The affidavit of Suggs, the president of PPCA, gives as the reason it failed to make the proposed loans to Neel the advice of the Federal Intermediate Credit Bank that a loan analysis was made showing that such loans would subject the Association to great risk, and also because of the outstanding first mortgage to Equitable in the amount of $800,000.

The district court based its holding with respect to PPCA largely on what it calls the plaintiff's admission that the $250,000 loan sought from PPCA would have been secondary to the Equitable mortgage in the amount of $880,000. What the district court did not account for in its analysis was the fact that Neel testified that the $500,000 loan he sought from PPCA would have been secured not only by a second mortgage on Neel's land, which, of course, would have been secondary to the first mortgage of Equitable, but it would also have been secured by a first mortgage on all of Neel's considerable personalty. Neel testified, thus far without contradiction, that the $500,000 would have refinanced his secured

---

4. Also referred to as an $800,000 loan.

chattel indebtedness. Neither does the affidavit of Suggs contradict Neel's testimony; rather, it is avoided. With respect to the $250,000 loan application made by Neel to PPCA following the failure of the $500,000 application, Neel testified, again without contradiction thus far, that that loan would have been secured by an agreement of the Farmers Home Administration to repay it; so, in fact, the $250,000 loan would have been without risk to PPCA. While it may ultimately turn out to be, as the district court found, that PPCA's refusals were the result of "sound business judgment," the reasons given by PPCA for refusing the loans are not in accord with the facts which Neel asserts were before everyone at the time. As with Bankers Trust, we are of opinion that PPCA has not conclusively shown that the facts upon which Neel relies to support his allegations were not susceptible to the interpretation which Neel seeks to give them. *First National Bank*, p. 289, 88 S.Ct. at p. 1592.

While the evidence against Bankers Trust is much thinner than it is against Waldrop and PPCA, we think that it should be kept in the case at least for the time being. Its thus far unexplained cancellation of credit to Neel without warning after years of apparently satisfactory dealing, together with its reliance on Neel's deteriorated financial condition, which is not shown to have existed, might be considered evidence of a refusal to deal. See *Klors v. Broadway-Hale Stores*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). It is true that Neel in his brief does not point to any benefits obtained by Bankers Trust from refusing to deal, and therefore it might be said that an inference of conspiracy from a parallel refusal to deal might not logically follow. See *First National Bank*, p. 287, 88 S.Ct. at p. 1591. But where we have two conflicting inferences and the affidavits are missing from those who have the answer to the question of why Bankers Trust called Neel's notes and cancelled his credit, we think the admonition of *Poller* should be followed and that summary judgment should not be granted in the case.

Neel argues in his brief that it is reversible error not to have granted him additional discovery despite the local rule which would not have permitted it. We do not find it necessary to pass on this question for we do not remand the case and necessarily direct a trial as opposed to further factual development. We do believe, however, that both the plaintiff and the defendants, the case being remanded in all events, are entitled to further discovery procedures. On remand, the district court will allow a reasonable amount of further discovery by both sides, following which it will take such action as it then may deem to be appropriate.

*AFFIRMED IN PART; VACATED IN PART; and REMANDED WITH DIRECTIONS.*