In re MID–ATLANTIC TOYOTA
ANTITRUST LITIGATION.

STATE OF MARYLAND ex rel. SACHS

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

STATE OF DELAWARE ex
rel. GEBELEIN

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

STATE OF WEST VIRGINIA ex
rel. BROWNING

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

DISTRICT OF COLUMBIA ex
rel. ROGERS

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

COMMONWEALTH OF PENNSYLVA-
NIA on its own Behalf and as
Parens Patriae

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

COMMONWEALTH OF VIRGINIA

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

Daniel E. GOLUB, et al.

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

Wallace H. JOHNSTON, Jr., et al.

v.

MID–ATLANTIC TOYOTA DISTRIBU-
TORS, INC., et al.

MDL–456.

Civ. A. Nos. Y–80–3238, Y–81–650, Y–81–726, Y–81–805, Y–81–1880, Y–82–479, Y–81–806 and Y–81–2954.

United States District Court,
D. Maryland.

April 4, 1983.

See also D.C., 541 F.Supp. 62.

Stephen H. Sachs, Atty. Gen. for the State of Md., Baltimore, Md., Charles O. Monk, II, and Michael F. Brockmeyer, Asst. Attys. Gen., Baltimore, Md., liaison counsel for plaintiffs.

Raymond W. Bergan, Scott B. Harris, and William J. Murphy, Washington, D.C., liaison counsel for defendants.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

The Judicial Panel on Multidistrict Litigation has consolidated the eight above-captioned actions for pretrial purposes and assigned them to this Court pursuant to 28 U.S.C. § 1407(a) (1976). These lawsuits include six actions brought by the Corporation Counsel of the District of Columbia and the attorneys general of Delaware, Maryland, Pennsylvania, Virginia, and West Virginia on behalf of their respective citizenry under the *parens patriae* provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. §§ 15c–15h (1976),[1] and two private treble damage antitrust actions asserted pursuant to 15 U.S.C. § 15 (Supp. V 1981).[2] All eight actions

1. The six consolidated *parens patriae* actions are *State of Maryland ex rel. Sachs v. Mid-Atlantic Toyota Distributors, Inc., et al.,* Civil No. Y–80–3238; *State of Delaware ex rel. Gebelein v. Mid-Atlantic Toyota Distributors, Inc., et al.,* Civil No. Y–81–650; *State of West Virginia ex rel. Browning v. Mid-Atlantic Toyota Distributors, Inc., et al.,* Civil No. Y–81–726; *District of Columbia ex rel. Rogers v. Mid-Atlantic Toyota Distributors, Inc., et al.,* Civil No. Y–81–805; *Commonwealth of Pennsylvania On Its Own*

*Behalf And As Parens Patrie v. Mid-Atlantic Toyota Distributors, Inc., et al.,* Civil No. Y–81–1880, and *Commonwealth of Virginia v. Mid-Atlantic Toyota Distributors, Inc., et al.,* Civil No. Y–82–479. As indicated above, the Commonwealth of Pennsylvania also sues on its own behalf.

2. The two private actions are *Golub, et al. v. Mid-Atlantic Toyota Distributors, Inc., et al.,* Civil No. Y–81–806, and *Johnston, et al. v. Mid-Atlantic Toyota Distributors, Inc., et al.,*

commonly allege violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (1976), by the regional Toyota distributor for the mid-Atlantic states and various local Toyota dealers within the distributor's region.[3] Plaintiffs in all actions have named three common defendants (hereafter "Weisman defendants"): the distributor, Mid-Atlantic Toyota Distributors, Inc. (hereafter "MAT"), its corporate affiliate, Carecraft Industries, Ltd. (hereafter "Carecraft"), and the controlling individual behind both entities, Frederick R. Weisman (hereafter "Weisman"). Individual dealers comprise all of the remaining defendants in each action and appear only in those suits appropriate to their respective geographic locations.

The Court currently has before it numerous defense motions for summary judgment.[4] After a full round of briefing, the Court heard oral argument on the motions on October 28, 1982. The Court subsequently concluded that it needed certain additional information for full consideration of the issues raised, and the parties promptly provided the Court with appropriate stipulations as well as supplemental memoranda commenting on the legal significance of the submitted information. After careful consideration of the extensive record in this litigation, the Court grants the defendants' motions to a limited extent and enters partial summary judgment in their favor on all claims grounded upon the so-called "Double Value Days" program. Fed.R.Civ.P. 56(d). The Court denies all other portions of the defense motions, but reviews certain principles of law which will govern the remainder of this litigation. In particular, the determination of § 1 liability may proceed under a *"per se"* standard, although not in the precise manner the plaintiffs have argued for. A fuller exposition of the scope of and basis for these rulings follows.

## SUMMARY JUDGMENT STANDARDS IN ANTITRUST LITIGATION

Summary judgment is ordinarily appropriate when:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

---

Civil No. Y–81–2954. The Court previously denied motions for class certification under Fed.R.Civ.P. 23 in both of these actions, *In re Mid-Atlantic Toyota Antitrust Litigation*, 93 F.R.D. 485 (D.Md.1982), and the cases have remained relatively dormant since that time.

**3.** Both private actions and the Pennsylvania and Virginia *parens* actions also assert "tying" claims pursuant to § 3 of the Clayton Act, 15 U.S.C. § 14 (1976). In a pretrial conference on October 28, 1982, the Court declared all current issues about the validity of the tying counts to have been mooted by the parties. Consequently, the present opinion will only address the plaintiff's § 1 claims, with the Court deferring any ruling on the tying counts until such time as the parties decide to raise the issue again.

**4.** The following defendants have filed formal motions: Mid-Atlantic Toyota Distributors, Inc., Frederick R. Weisman, and Carecraft Industries, Ltd., MDL–456, Pleading No. 116; Schaefer & Strominger, Inc., MDL–456, Pleading No. 142; Washington Area Dealer defendants, MDL–456, Pleading No. 143; Castle Toyota, Inc., Civil No. Y–80–3238, Pleading No. 169; Jones Plymouth, Inc., Civil No. Y–80–3238, Pleading No. 170; Torrey, Inc., Civil No. Y–80–3238, Pleading No. 172; R & H Motor Cars, Inc., Civil No. Y–80–3238, Pleading No. 173; Russel Motor Cars, Inc., Civil No. Y–80–3238, Pleading No. 173; Younger Toyota, Inc., Civil No. Y–80–3238, Pleading No. 174; Laurel Toyota, Inc., Civil No. Y–80–3238, Pleading No. 175; Delaware dealer defendants, Civil No. Y–81–650, Pleading No. 44; Certain Pennsylvania dealer defendants, Civil No. Y–81–1880, Pleading No. 302; and Southern Virginia dealer defendants, Civil No. Y–82–479, Pleading No. 179. While certain defendants originally styled their motions as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), the Court ruled during a pretrial conference on June 25, 1982, that all motions for judgment on the pleadings would be treated as Fed.R.Civ.P. 56 motions for summary judgment. The Court notes that certain defendants have filed formal motions while others have only submitted supportive or reply memoranda "joining in" other defendants' formal motions. To avoid confusion and needless balkanization, the Court will treat all defendants as having appropriately moved in all actions for summary judgment upon the general *factual* grounds which the states have had an opportunity to respond to in their two memoranda.

Fed.R.Civ.P. 56(c). The Fourth Circuit has amply elaborated upon this standard in an opinion which merits quotation at length:

It is well settled that summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances. [sic] Neither should summary judgment be granted if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions. 3 Barron & Holtzoff, Federal Practice & Procedure § 1234 (Rules ed. 1958). Burden [sic] is upon party moving for summary judgment to demonstrate clearly that there is no genuine issue of fact, and any doubt as to the existence of such an issue is resolved against him. 3 Barron & Holtzoff, Federal Practice & Procedure § 1235 (Rules ed. 1958).

In *Kirkpatrick v. Consolidated Underwriters*, 227 F.2d 228 (4th Cir.1955), this court repeated its holding in *Pierce v. Ford Motor Co.*, 190 F.2d 910 (4th Cir. 1951), that summary judgment under Rule 56 should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. This is true even where there is no dispute as to the evidentiary facts but only as to the conclusions or inferences to be drawn therefrom, and the "party opposing a motion for summary judgment is entitled to all favorable inferences which can be drawn from the evidence." *Cram v. Sun Ins. Office, Ltd.*, 375 F.2d 670, 674 (4th Cir.1967).

As we stated in *American Fid. & Cas. Co. v. London & Edinburgh Ins. Co.*, 354 F.2d 214, 216 (4th Cir.1965):

"Not merely must the historic facts be free of controversy but also there must be no controversy as to the inferences to be drawn from them. It is often the case that although the basic facts are not in dispute, the parties nevertheless disagree as to the inferences which may properly be drawn. Under such circumstances the case is not one to be denied on a motion for summary judgment."

*Phoenix Savings and Loan, Inc. v. Aetna Casualty & Surety Co.*, 381 F.2d 245, 249 (4th Cir.1967).

In light of this strict standard, it is not surprising that some courts have traditionally demonstrated a marked reluctance towards summary disposition of complex antitrust cases. *See, e.g., Norfolk Monument Co., Inc. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141–42 (4th Cir.1979). *See generally* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2732.1 at 313–31 (2nd Ed.1983). As Justice Clark said for the majority in *Poller*:

summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury. * * *

*Poller*, 368 U.S. at 473, 82 S.Ct. at 491. On the other hand, the Supreme Court has indicated that some limits exist upon this judicial reluctance:

To the extent that petitioner's argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support these allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust com-

plaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence to support the complaint.

*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). *Accord National Electrical Contractors Association, Inc. v. National Constructors Association,* 678 F.2d 492, 497 (4th Cir.1982). *See generally* 2 P. Areeda & D. Turner, *Antitrust Law* ¶ 316 (1978) (suggesting broader appropriateness of summary judgment). Nevertheless, summary disposition remains a highly elusive goal in cases such as the present one which contain allegations of § 1 conspiracy dependent upon divination of subjective intent. *Neel v. Waldrop,* 639 F.2d 1080, 1084 (4th Cir.1981).

## REVIEW OF THE UNDISPUTED FACTS AND DISPUTED ALLEGATIONS [5]

This case centers around the antitrust implications of two sets of multiple individual agreements between MAT and its dealers regarding a package of accessories for 1980 model Toyotas. Featuring "Polyglycoat" brand sealant products, the package of accessories (hereafter "protective package") included rustproof shielding, paint sealant, interior (textile or vinyl) sealant, souldshielding (undercoating), and membership in the "Cross Country Motor Club." [6]

The parties do not dispute the facial elements of the individual contracts within each set of agreements. In the first group of agreements, solicited by MAT under its "Total Concept Protective Program" (hereafter "Total Concept Program"), each dealer individually contracted with MAT to have the protective package applied to all of the 1980 Toyotas the dealer ordered, at a cost to the dealer of $113.90.[7] The protective package on cars furnished under the Total Concept Program had a suggested retail price of $533.90 listed on the "sticker" which the Monroney Act, 15 U.S.C. §§ 1231–1233 (1976), requires automobile manufacturers and distributors to attach to all new vehicles.

In the second set of agreements, entered into as part of the distributor's "Double Value Days" program, many dealers individually contracted with the distributor to reduce the price on all Toyotas containing the protective package by the full suggested retail price of $533.90. In consideration, the distributor would rebate to the dealer the entire wholesale price of $113.90. This retail discount did not actually appear on the Monroney sticker. Instead, the participating dealer agreed to inform the customer of the $533.90 discount at the time the dealer initially showed the customer the car (*i.e.,* the dealer agreed not to wait and see if perhaps the customer would take the car without the discount).

While these bare contractual terms appear to be conceded by all parties, the import of these individual agreements when

---

**5.** In determining the existence of a genuine issue of material fact, a court views the record in the light most favorable to the non-moving party. *Poller,* 368 U.S. at 473, 82 S.Ct. at 491; *Neel,* 639 F.2d at 1082; 2 P. Areeda & D. Turner, *supra,* at 58. Exhuming legitimate disputes which might not otherwise be noticed, this principle particularly applies when conflicting inferences may be drawn "from the subsidiary facts contained in the affidavits, attached exhibits, and depositions . . . .", *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Consequently, the following discussion primarily focuses upon the evidence in the record supporting the plaintiffs' allegations. The Court recognizes that the record contains significant contrary evidence and obviously does not attempt to sit as the trier of fact at this early stage of the litigation. However, for purposes of econo-

my in a regrettably lengthy opinion, the Court will not dwell upon the defendants' contrary factual allegations.

**6.** Some indication exists that on occasion not all of the five accessories were actually applied to a given car. However, as the parties appear to be in accord that all five components usually came together, the Court will follow the parties practice and assume for the sake of convenience that all five accessories were consistently applied.

**7.** The Court recognizes that the wholesale cost to the dealer as well as other relevant price figures varied over time.

The Court will ignore all such minor monetary fluctuations.

cumulated is hotly disputed. Asserting that far more exists to these two aggregations of contracts than meets the eye, the plaintiffs allege that defendants used these agreements as the convenient vehicle for a massive price-fixing conspiracy. The defendants counter that these agreements were discrete, atomized, and designed to promote interbrand competition in the retail automobile market. To consider fully these divergent contentions, let alone attempt to resolve them, one must first appreciate the independent interest the Weisman defendants had in promoting the sale of the components of the protective package.

*The Weisman Defendants: Structure and Interests*

Counsel for the Weisman defendants have stipulated to the relevant facts concerning both the interrelationships among the Weisman defendants and their financial interest in the sale of the Polyglycoat products. For the entire time period relevant to this litigation, individual defendant Frederick R. Weisman owned and controlled numerous corporate entities through the Frederick Weisman Holding Company.[8] The corporate subsidiaries of the holding company included both distributor defendant MAT[9] and defendant Carecraft's stipulated predecessor in interest Crown Atlantic Corporation (hereafter "Crown Atlantic"). Mr. Weisman served as president of both entities.

Crown Atlantic was MAT's "port handling agent" in Baltimore, accepting the 1980 Toyotas off the ships from Japan and preparing them for distribution to the various local dealers. In particular, Crown Atlantic actually applied the Polyglycoat sealant products to the vehicles covered by the contracts in question. Crown Atlantic itself owned CPC Distributors, Inc. (hereafter "CPC"), a franchised distributor of Polyglycoat Corporation automotive products.[10]

In summary, Weisman's companies possessed distributional franchises for both Polyglycoat products and Toyotas. CPC exercised its Polyglycoat distributorship on a consignment basis, paying the Polyglycoat Corporation $42.00 for every vehicle equipped with the protective package.[11] CPC in turn sold the package for a profit to Crown Atlantic, which applied the sealant components of the package and billed MAT $78.00 for product and labor. As previously mentioned, MAT would charge its dealers $113.00 per covered vehicle. When these transactions are consolidated, it becomes evident that Weisman, through his companies, received a 260% markup between the price paid Polyglycoat Corporation and the price charged the local Toyota dealers for the protective package.

*Defendants' Potential Motivations for Entering Into the Agreements*

With the Weisman defendants' Polyglycoat interests plainly in view, one can more readily appreciate the multiple potential incentives which may have prompted the contracts in question. As will be elaborated upon later, the incentives actually motivating the defendants to bargain together will play a crucial role in several liability issues. The Court of course does not presently rule

**8.** The Frederick Weisman Holding Company later changed its name to the Frederick Weisman Company. Weisman apparently did not own stock in the holding company directly but instead controlled it through the "Weisman Group," which in turn consisted of the Frederick R. Weisman Family Trust, Richard L. Weisman (Weisman's son), and Lerand, Inc. (an investment firm in which Frederick R. Weisman held a 5% equity interest and in which he and Richard L. Weisman each held 50% of the voting shares). The parties have simplified matters by stipulating that "during all relevant times, Frederick R. Weisman directly, through members of his immediate family, or through corporate interests was a majority shareholder of relevant corporate entities."

**9.** Weisman interests never possessed 100% ownership of MAT but instead "substantially owned" the distributor through control of more than 80% of the outstanding shares.

**10.** Between January, 1979 and September, 1979, CPC was controlled not by Crown Atlantic but by Crown Pacific Corporation, another Weisman company.

**11.** The Polyglycoat Corporation sold CPC the rights to the Cross Country Motor Club membership along with its own sealant products.

on which motivations actually controlled, but merely review the possibilities open to the ultimate trier of fact.

Three alternative incentives may have motivated the Weisman defendants.[12] The plaintiffs assert that the driving force behind the Weisman defendants' initiation of these programs was a desire to sell more Toyotas. It does not appear to be disputed that MAT had had a relatively poor market penetration vis-a-vis other Toyota regional distributors during the late 1970's. As MAT received a constant profit margin per wholesale sale regardless of the ultimate retail price, its revenues were almost completely dependent upon the *volume* of retail sales as opposed to the price obtained in those sales. According to a market study performed for MAT in 1979 by the management consulting firm Harbridge House, MAT had become trapped in a "viscious cycle" of declining regional sales volume:

1. The regional dealers extracted too high a profit per car sold and hence depressed total retail sales;

2. The national Toyota importer employed a formula for allocating the available imports among the various regional distributors which penalized distributors with slower turnover rates and higher inventories;

3. The proportionately fewer imports allocated to MAT under this formula reduced dealer confidence that MAT could satisfy their needs should they switch to a high volume, low profit per car strategy; and

4. The dealers therefore saw no reason to switch from their low volume, high profit per car approach.

The Harbridge House report recommended that MAT attempt to reduce the dealer profit per car, but recognized that the individual dealers would probably take a dim view of this proposal unless MAT provided them with credible assurances that it could actually fill the increased orders that such an approach would produce.

The States assert that the protective package provided MAT with an opportunity to break out of this "vicious cycle." Central to their argument is the assumption that automobile consumers base their purchasing decisions as much on the perceived "deal" or

12. In accordance with the admonition that a court entertaining a summary judgment motion must view the record in the light most favorable to the non-moving party, the Court treats the Weisman defendants as a single economic unit for the purposes of this motion. It is true that the Supreme Court has frequently invoked an "intra enterprise conspiracy doctrine" and declared commonly owned corporate entities to be legally distinct actors capable of conspiring together in violation of § 1. *United States v. Citizens & Southern National Bank,* 422 U.S. 86, 116, 95 S.Ct. 2099, 2116, 45 L.Ed.2d 41 (1975) (dicta); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–86, 20 L.Ed.2d 982 (1968); *Kiefer-Stewart Co. v. Seagram & Sons, Inc.,* 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co.,* 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947). *But cf. Sunkist v. Winckler & Smith Co.,* 370 U.S. 19, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962) (farmer's combination itself permissible under Capper-Volstead Act not distinct from its subsidiaries). However, the Supreme Court has never fully elaborated on the parameters of this doctrine, and the Circuit Courts, no doubt prompted by criticism of the doctrine by learned commentators, *see, e.g.,* P. Areeda, *Antitrust Analysis* ¶ 334 (3rd ed. 1981), have developed numerous exceptions to the general rule. See generally authorities collected in *Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 455–56 n. 8 (9th Cir.1979). In particular, a "one man show" exception has recently evolved in the Ninth Circuit: corporate entities controlled by a single individual are treated as a single business unit when that individual made the relevant decisions. *Thomsen v. Western Electric Co., Inc.,* 680 F.2d 1263, 1266 (9th Cir.1982); *Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614 (9th Cir.1979); *Harvey,* 589 F.2d at 457; *Knutson v. Daily Review, Inc.,* 548 F.2d 795 (9th Cir.1976) (alternative holding). The Court finds these authorities to be well reasoned and rules that as a matter of law a "one man show" exception exists to the general rule of intra-enterprise conspiracy. However, as the parties have not had an opportunity to marshall the facts in light of these principles, the Court will not definitively apply them to the particulars of this case at the present time. The Court also reserves ruling on the disputed issue of whether the applicability of the intra-corporate conspiracy rule or its exception is itself a question of fact or law. See generally discussion of authorities in *Oglivie v. Fotomat Corp.,* 641 F.2d 581, 588 (8th Cir. 1981).

"bargain" they are getting as on the absolute price they actually pay. By adding a set of accessories to a Toyota with a wholesale price of $133.00 but with a suggested retail price on the Monroney sticker of $533.00, MAT supposedly gave its dealers $420.00 worth of room to "bargain" with. The dealer could discount from the suggested retail price and increase the "deal" a buyer perceived he was receiving without reducing the dealer's original profit margin on the car. The defendants generally agree with plaintiffs' assertion that the programs were designed to increase Toyota sales. However, defendants prefer to stress the alleged intrinsic value of the protective package itself[13] as the means by which the protective package could generate those sales.

In addition to the plaintiffs' position, the record reveals two alternative possible motivations for the Weisman defendants. One is that the Weisman defendants were motivated not by a desire to sell more Toyotas to the public but by a desire to sell more Polyglycoat products to the Toyota dealers. The record reveals potential evidence that:

1. Weisman had attempted for several years to get the dealers to order Polyglycoat products;

2. The chief executive officer of MAT consistently opposed programs involving Polyglycoat products but Weisman regularly overruled him;

3. Weisman assumed greater personal control of MAT at the time the protective package programs were initiated;

4. After meeting with his subordinates, Weisman personally initiated the protective package programs at issue here; and

5. After institution of the program, MAT continued to be reluctant to implement it as fully as Crown Atlantic's representative desired.

Such evidence might support an inference that Weisman had decided that the potential increased profits for his Polyglycoat distributorship would outweigh any potential losses feared by his Toyota distributorship and that hence the program should go forward despite the misgivings of MAT itself.

The third and perhaps most plausible alternative motivation for the Weisman defendants was that they hoped to increase both Toyota and Polyglycoat sales. Significant documentary evidence in the record exists to this effect.

Alternatives also exist as to what financial considerations allegedly impelled the individual dealers to join the Total Concept program.[14] A dealer might have been tempted to use the higher suggested retail price as a device to maximize per car profits even further. Conversely, a dealer might have concurred in MAT's assessment of the need to increase sales volume and utilize the full opportunity for discounting which the accessory profit spread would provide. The dealers themselves intimate that the protective package afforded them an opportunity for what would be in effect price discrimination. They could charge the uncomplaining buyer the full $533.00 but use the discount potential to secure the wavering buyer who balked at the full price. In this manner, they could perhaps increase both per car profits and sales volume.

*The Alleged Barrier to Utilizing Polyglycoat Products: Dealer Atomization*

In spite of the potential incentives reviewed above, relatively few Toyotas were sold with Polyglycoat products in the years

---

13. The defendants allege that the price of the protective package was lower than the sum of the retail prices of its constituent components.

14. As a dealer joining the Double Value Days program was by the terms of the individual agreement relinquishing the possibility of additional per car profit, the only rational motivation which could be inferred from his participation in the program would be a desire to in-

crease sales volume by "giving away" the protective package. Similarly, the Weisman defendants could have only sought to stimulate Toyota sales by establishing the Double Value Days program, since they were contractually relinquishing the profit they had garnered on the sale of the protective packages to the dealers.

preceding the initiation of the protective package programs in September, 1979.[15] Plaintiffs assert, and defendants vigorously dispute, that the dealers were previously reluctant to order cars with the sealants because consumers did not like the products and other Toyota dealers selling cars without the sealants would be able to undercut them. The record does contain documents expressly stating that certain dealers did not care for the Polyglycoat products because of "competitive" reasons. As a Vice-President of Rosenthal Toyota, Inc., wrote to MAT, "We are in a very competitive market in the Greater Washington area and these port installed options will not allow us to be able to compete with the other Toyota dealers." The record also contains potential evidence that MAT incurred its dealers' wrath by attempting to force Polyglycoat products upon them. Supposedly prompting complaints to the national importer, these "coercive" tactics also allegedly provoked a charge by the Maryland Motor Vehicle Administration that MAT had violated the express language of Md.Trans.Code Ann. § 15–207(b)(2) (Michie 1977), by attempting to "coerce [a] dealer to order or accept delivery of . . . accessories for a vehicle . . . that is not required by law or by the dealer's franchise or that was not ordered voluntarily by the dealer."

Defendants strongly claim that fears of competitive disadvantage did not prompt the dealers to reject Polyglycoat products, and point to significant deposition testimony to that effect.[16] However, this only raises the genuine issue of fact which a court cannot resolve on summary judgment. For purposes of the present motion, it is sufficient that the record suggests that evidence might well be introduced at trial which would allow the trier of fact to conclude that the dealers had largely avoided Polyglycoat products before September, 1979 because of competitive concerns.

*Overcoming The Atomization: The Total Concept Program*

Supposedly unable to overcome this individualized dealer reluctance by forcing the Polyglycoat products on them, the Weisman defendants allegedly decided to attack the dealer's underlying competitive concerns directly by facilitating an interdealer conspiracy. In the late summer of 1979, MAT announced the "Total Concept Protective Program" and urged its dealers to order all of their 1980 models with the sealant pre-applied. MAT convened a series of subregional dealer meetings which both Weisman and substantially all of the dealers attended.[17] Hearing a report by a Harbridge House representative similar to the economic analysis summarized earlier,[18] the dealers then received a direct appeal from William Abbott, MAT Vice-President for marketing, in support of the program. Abbot allegedly stressed the flexibility the protective package afforded the dealers, with the dealer keeping the full additional profit unless the customer balked.[19] The additional profit margin attached to the package would then allow the dealer to "close the deal" without harming his original profit margin.

15. While the parties disagree and the record is not clear on exactly how many Toyotas were equipped with Polyglycoat products before September, 1979, it appears beyond dispute that markedly fewer cars were equipped with the sealant before the program than were equipped during the program.

16. For example, one dealer claims that he did not order the Polyglycoat because Crown Atlantic did a very sloppy job of applying the sealants at the port, necessitating a significant cleaning effort on the dealer's part.

17. MAT did not convene the meetings solely to promote the Total Concept Program. Defendants allege that the Program was only one among many promotional efforts pushed at the meetings.

18. The parties dispute the extent to which the Harbridge House representatives stressed the need for "joint" action by the dealers to break out of the "viscious cycle."

19. The Court notes some inconsistency between the Harbridge representative's stress on lower per car profits and Abbott's claims of the potential for increased profits per car. This inconsistency might be resolved if one assumes that the price discrimination available with the protective package would equal a flat automatic discount in economic results.

Controversy swirls over what happened after Abbott's presentation. The plaintiffs allege that the dealers "milled around," hovering over sign-up sheets which stated "Yes, we want to participate in the Polyglycoat Total Concept Program" and discussing unrevealed subjects. It appears to be undisputed that significant numbers of dealers did in fact sign up at the meetings, that MAT conducted at least some followup on those dealers who did not sign up at the time, and that by January, 1980 all but three dealers either had signed up or were ordering the protective package on their vehicles. Conceding this widespread dealer participation with the program, defendants proffer numerous dealer depositions indicating that each dealer signed up for the program solely for independent business reasons.[20] Plaintiffs counter that the meetings, signup sheets, and followups provide strong circumstantial evidence that the dealers instead conspired with each other uniformly to incorporate the protective package into all Toyotas sold in the region and raise the suggested retail price of all Toyotas by $533.00.

Plaintiffs also submit affidavits asserting that Polyglycoat-free Toyotas became almost impossible to obtain after the Total Concept Program took force. One consumer states that dealers told him they would have to wait for up to eight months to obtain a vehicle without the accessories. Having so far operated on the assumption that this is a *per se* case, plaintiffs have not submitted any evidence on what actual effect the Total Concept Program had upon retail prices. Defendants point to some assertions that most dealers "gave the protective package away" by discounting the retail price by the full amount of the accessory profit margin. The dealers also contend that only 60% of the 1980 Toyotas actually had the protective package applied to them. Finally, some documents before the Court indicate that regional Toyota sales climbed dramatically in the months after the institution of the program.

**20.** Some deposition testimony also indicate that the dealers desired uniform adherence to the Program in order to (1) increase the efficiency of the port operation and hence speed

*Overcoming the Atomization: The Double Value Days Program*

From January, 1980 to March, 1980, MAT supplemented the Total Concept Program with the Double Value Days Program: those dealers who discounted the entire $533.00 suggested retail price to the consumer would themselves receive a $113.00 rebate from MAT. The defendants do not contest the existence of this program, but question how it could possibly injure an automobile purchaser who was essentially getting something for nothing. Plaintiffs have responded that they are not sure that the dealers adhered to the agreement and actually provided the full discount to the purchasers.

## STATUTORY OVERVIEW: THE THREE BASIC ISSUES

The *parens patriae* plaintiffs sue under 15 U.S.C. § 15c(a)(1), which states in relevant part:

> Any attorney general of a State may bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State, in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section *for injury sustained* by such natural persons to their property by reason of any violation of Sections 1 to 7 of this title [emphasis supplied].

15 U.S.C. § 15 provides the authority for the private plaintiff's treble damage action:

> Any person *who shall be injured* in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee [emphasis supplied].

the delivery of the cars to the dealers and (2) improve the possibility of interdealer exchanges of inventory to assist a dealer who had closed an unexpectedly large number of sales.

To assert a cause of action under either statute, a plaintiff must, as indicated by the phrases highlighted in the above quotations, assert actual injury sustained either by the plaintiff or those on whose behalf he is suing.

The alleged substantive violation of the antitrust laws which must underlie either a *parens patriae* or treble damage action is in turn based upon § 1 of the Sherman Act:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...

15 U.S.C. § 1 (1976). While the language of § 1 appears on its face to condemn all contracts "in restraint of trade," the Supreme Court has long ruled that "it cannot mean what it says." *National Society of Professional Engineers v. United States,* 435 U.S. 679, 687, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Instead, the ordinary restraint of trade will be deemed illegal only if the actual competitive effects the restraint has upon the relevant market demonstrate it to be an *unreasonable* restraint of trade. *Id.* at 690, 98 S.Ct. at 1364. As the Court knows from experience, a case tried under this "Rule of Reason" standard of liability frequently involves almost overwhelming factual complexity. In response to this practical problem, the Supreme Court has carved out certain exceptions to the Rule of Reason for "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm that they have caused or the business excuse for their use." *Northern Pacific Railroad Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). *Accord Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 7–8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979).

Courts describe such agreements as "illegal *per se*" and do not require demonstration of actual competitive impact in the particular case. *Id.* As Justice Stevens has recently summarized,

There are, thus, two complementary categories of antitrust analysis. In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they are "illegal *per se.*" In the second category are agreements whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed.

*Engineers,* 435 U.S. at 692, 98 S.Ct. at 1365.

In attempting to apply these basic authorities, the parties have raised three separate issues:

*First,* does the present record contain sufficient evidence to create a genuine issue as to the existence of a § 1 "contract, combination or conspiracy" among the defendants?

*Second,* if one assumes that such a combination existed, is the determination as to whether the combination was "in restraint of trade" governed by a *per se* or a Rule of Reason standard?

*Third,* if one assumes that a combination in restraint of trade existed, have the plaintiffs alleged §§ 15, 15c "injury" to the Toyota purchasers?

The Court will address these issues *seriatim.*

## LIABILITY UNDER § 1: CONTRACT, COMBINATION OR CONSPIRACY?

No one disputes that the Total Concept Program involved individual "contracts" between MAT and its dealers. Taken alone, such an individual contract plainly did not create antitrust problems.[21] However, the

---

**21.** A dealer might have attempted to contend that the contract was a "tie" in violation of § 3 of the Clayton Act, 15 U.S.C. § 14 (1976). However, the dealer would have had to establish that MAT coerced him into taking the tied

product along with the tying product. *Ogden Food Service Corp. v. Mitchell,* 614 F.2d 1001, 1002 (5th Cir.1980); *Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658, 661–63 (2d Cir.1974). In the present case, the

plaintiffs base their claim of § 1 concerted action upon an additional agreement among the dealers themselves and between the dealers as a group and the Weisman defendants. To clarify the analysis of this issue, the Court first examines the possibility of concerted action among the dealers alone. As it finds that sufficient potential evidence exists to raise a genuine issue about interdealer concerted action, the Court then assumes the existence of an interdealer conspiracy and evaluates whether the Weisman defendants can be added on as additional co-conspirators with the dealers.

*Concerted Action Among the Dealers*

While § 1 speaks of "contract, combination, or conspiracy," courts have read the phrase "as an alliterative compound noun, roughly translated to mean 'concerted action.'" *Edward J. Sweeney & Sons, Inc. v. Texaco,* 637 F.2d 105, 111 (3rd Cir.1980) (quoting *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 445–46 (3rd Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)). Hence, "the statutory language presents a single concept about common action, not three separate ones." *Sweeney & Sons,* 637 F.2d at 111. In determining the existence of such concerted action, "proof of § 1 conspiracy need not be direct," *United States v. Foley,* 598 F.2d 1323, 1331 (4th Cir.1979), and "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954). Most importantly, "it has long been settled that explicit agreement is not a necessary part of a Sherman Act conspiracy." *United States v. General Motors,* 384 U.S. 127, 142–43, 86 S.Ct. 1321, 1329, 16 L.Ed.2d 415 (1966). *Accord Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939). Instead, "the crucial question is whether ... [the defendants'] conduct stemmed from independent decision or from an agreement, *tacit* or express [emphasis supplied]." *Theatre Enterprises,* 346 U.S. at 540, 74 S.Ct. at 259. Some examination of the elements of a § 1 "tacit" agreement is merited.

■ It is clear that proof of consciously parallel business behavior without more does not entitle a plaintiff to a directed verdict in his favor. *Theatre Enterprises,* 346 U.S. at 541–42, 74 S.Ct. at 259–60. While the Supreme Court in *Norfolk Monument,* 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658, reversed a directed verdict for defendants where the record contained only evidence of similar business practices by the defendants, many Circuit Courts have construed *Theatre Enterprises* to authorize summary judgment or a directed verdict for defendants when the exclusive evidence is of parallel behavior. *See, e.g., Dahl, Inc. v. Roy Cooper Co.,* 448 F.2d 17, 19 (9th Cir. 1971). However, additional indicia of concerted action above and beyond mere parallelism ordinarily will allow a case to reach the jury. *See generally* Areeda, *supra,* at ¶ 325 (reviewing most common "plus factors"). Professor Areeda calls one such category of additional evidence "actions facilitating oligopolistic collaboration." *Id.* at 379.

The two Supreme Court decisions establishing the doctrine of "tacit agreement" provide apt examples of "facilitating actions." In *Interstate Circuit,* 306 U.S. at 208, 59 S.Ct. at 467, two powerful first run motion picture exhibitors faced competition from certain second run exhibitors who charged a markedly lower admission price for the same film. Thwarting such competition indirectly, the first run houses obtained separate agreements from each of the eight major movie distributors that each distributor would sell to the second run

---

dealers plainly had the option of purchasing their 1980 models without the protective package.

While the individual Total Concept Program contracts posed no antitrust concerns, each individual Double Value Days contract did in fact create a vertical price fixing agreement, as discussed at pages 783–784, *infra.* Plaintiffs do not appear to allege that the Double Value Days contracts taken collectively constituted an additional restraint of trade, and the Court will not consider that issue.

houses only on the condition that the second run houses raise their admission prices. To enlist the distributors' assistance in this plan, the first run houses sent a letter jointly addressed to all distributors informing them that the first runs would not deal with an individual distributor unless that distributor agreed to impose the restraints upon the second runs. The first runs then followed up the letter with a series of separate meetings with each distributor at which they obtained each individual distributor's agreement.

The Supreme Court held that sufficient circumstantial evidence existed to support a finding of express agreement among the distributors. Noting that the distributors failed to produce any witness who would have had personal knowledge of whether an interdistributor agreement existed or not, Justice Stone also commented in part:

> The O'Donnell letter named on its face as addressees the eight local representatives of the distributors, and so from the beginning each of the distributors knew that the proposals were under consideration by the others. Each was aware that all were in active competition and that without substantially unanimous action with respect to the restrictions for any given territory there was risk of a substantial loss of the business and good will of the subsequent-run and independent exhibitors, but that with it there was the prospect of increased profits. There was, therefore, strong motive for concerted action, full advantage of which was taken by Interstate and Consolidated in presenting their demands to all in a single document.

*Interstate Circuit,* 306 U.S. at 222, 59 S.Ct. at 472. More importantly, Justice Stone then described why the evidence permitted a finding of concerted action *without* an express agreement:

> While the District Court's finding of an agreement of the distributors among themselves is supported by the evidence, we think that in the circumstances of this case such agreement for the imposition of the restrictions upon subsequent-run ex-

hibitors was not a prerequisite to an unlawful conspiracy. *It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.* Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce, and knowing it, all participated in the plan. The evidence is persuasive that each distributor early became aware that the others had joined. With that knowledge they renewed the arrangement and carried it into effect for the two successive years.

> It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators... Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act [emphasis added].

*Interstate Circuit,* 306 U.S. at 226–27, 59 S.Ct. at 474.

The Supreme Court reaffirmed its doctrine of "tacit agreement" in *United States v. Masonite Corporation,* 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942). *Masonite* entered into a series of "agency" agreements with its competitors which Justice Douglas ultimately found to constitute a subterfuge for intra-industry price fixing. While Masonite secured each competitor's agreement separately, each competitor knew that Masonite was entering into similar agreements with the other firms. The Supreme Court ruled that these facts alone could support a finding of concerted action:

> there can be no doubt that this is a price-fixing combination which is illegal *per se* under the Sherman Act. That is true enough though the District Court found that, in negotiating and entering into the first agreements, each appellee, other

than Masonite, acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others. It is not clear at what precise point of time each appellee became aware of the fact that its contract was not an isolated transaction but part of a larger arrangement. But it is clear that, as the arrangement continued, each became familiar with its purpose and scope. Here, as in *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226 [59 S.Ct. 467, 474, 83 L.Ed. 610], "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. [citations omitted].

*Masonite,* 316 U.S. at 274–75, 62 S.Ct. at 1076.

A recent Fourth Circuit decision demonstrates that *Interstate Circuit* and *Masonite* are far from anachronisms. In *United States v. Foley,* 598 F.2d at 1323, real estate brokers in Montgomery County, Maryland faced severely declining revenues. When one broker attempted unilaterally to raise his commission percentage, competition forced him back down. Another broker then held a dinner for his competitors and announced that, regardless of what the others did, he was raising his commission. Evidence conflicted over what was discussed at the dinner following the announcement, but all attendees subsequently did raise many of their commissions. Essentially following the *Interstate Circuit* language of "acceptance of an invitation," the Fourth Circuit affirmed the defendants' felony convictions.

Application of these authorities leaves no doubt that plaintiffs have raised an issue of whether the Total Concept Program constituted concerted action by the defendants to raise the starting price for 1980 Toyotas.[22] The record contains potential evidence that:

22. The plaintiffs have alleged a conspiracy to raise the suggested retail price. However, the coexistence of the Monroney and Sherman Acts require that § 1 liability can attach only for a tacit agreement to increase the starting point in dealer/customer negotiations by the amount of the suggested retail price of the accessories. In other words, the dealers had to have impliedly agreed that each would not unilaterally discount the price of the Toyota before commencing negotiations with the customer. Such a unilateral reduction is what the Weisman defendants requested in the Double Value Days Program but is precisely the opposite of what Abbott urged each dealer to do in the initial Total Concept Program. Abbott allegedly told the dealers that they could charge the full $533.00 and keep the resulting $420.00 unless the customer balked. A tacit agreement among the dealers that each would do exactly what Abbott was suggesting would, as will be explained *infra,* create problems under the antitrust laws.

The Court also notes that defendants assume that plaintiffs have alleged (1) an agreement among the dealers to order all of their Toyotas with the protective package with (2) the [agreed] purpose of raising the suggested price. Defendants base many of their arguments about the proper definition of price fixing upon this characterization of plaintiffs' position. The Court has carefully examined plaintiffs' submissions and believes that plaintiffs' posi-

tion could also be characterized as: (1) an agreement among the defendants to raise the suggested price (2) via the facilitating mechanism of uniform application of the protective package. Defendants do not squarely address this alternative position of plaintiffs and, when combined with their certainly justifiable failure to anticipate the Court's current ruling on the suggested/starting price distinction, appear understandably to assume as the premise of their price fixing argument that plaintiffs have not marshalled sufficient circumstantial evidence to raise a genuine issue about a tacit interdealer agreement to raise the starting price (as opposed to an interdealer agreement to order all of their Toyotas with the protective package). As will be intimated later, many of defendants' arguments on the *per se* issue may have some merit if one assumes that the agreement in question is an agreement for uniform ordering of the protective package. However, before one determines the standard that must be employed to ascertain whether a tacit agreement is in restraint of trade, one must first determine what that tacit agreement is. As the Court finds sufficient circumstantial evidence to raise an issue about a tacit agreement to raise the starting price, the Court will approach the *per se* issue with that agreement in mind. Plaintiffs of course should amend their pleadings to allege concerted action by a tacit agreement to raise the starting price.

1. As in *Interstate Circuit,* raising the starting price contained profit potential (because the starting price would become the actual price unless the purchaser balked), but unilateral action posed competitive peril (since other Toyota dealers would be offering cars that were both "cleaner and cheaper").

2. The Weisman defendants assembled groups of dealers and invited them to join in the program, specifically telling each gathering of the profit potential that pocketing the starting price promised. Abbott raised the core element of the agreement—keeping the suggested price as the starting price—in a collective gathering of precisely those people who had the anti-competitive financial incentive to adopt it as a joint course of action. While meetings among competitors without more are not *per se* illegal, it certainly is not rank speculation to observe that a meeting provides an ideal device for facilitating horizontal agreements once the anti-competitive idea is jointly planted in the minds of those competitors present at the meetings.

3. The Weisman defendants then facilitated the dealers' adherence to the scheme by circulating sign up sheets. The use of these sheets allowed each dealer to observe which other dealers were joining the program. While the sign up sheets specifically dealt with ordering the protective package, and hence certainly are competent circumstantial evidence of a tacit agreement for uniform ordering, they also could have served as a facilitating mechanism for an agreement to raise the starting price, especially when viewed in the light of Abbott's comments about profit potential immediately prior to their circulation.

4. MAT representative had followup meetings with those dealers who attended the meeting, but did not sign up, to pressure them to join. *Masonite* indicates that these individual meetings alone could suffice if each dealer knew, as indeed each must have known by attending the group meetings, that others were participating in the same program.

5. At least one dealer has testified in his deposition that the suggested price usually was the starting price. If true, this standard practice provided an additional facilitating mechanism for raising the starting price—dealers had less cause to doubt mutual adherence to their joint course of action if such action was an adjunct to ordinary procedures. While the dealers had a right and a duty under the Monroney Act to display a uniform suggested price set by the manufacturer, they had neither a duty nor a right jointly to utilize that suggested price as a starting point in price negotations.[23]

6. A marked change in dealer purchasing patterns occurred between August, 1979 and January, 1980. If the previously mentioned congruence between suggested price and starting price as a standard business practice is also established, then one rational inference from the uniform ordering of the protective package would be that starting prices also rose over that period. The fact that the Weisman defendants had to institute the Double Value Days Program, which as previously mentioned automatically eliminated any increase in the starting price, also supports the inference that the dealers were utilizing the suggested price as the starting point and were in fact not discounting as often as Mr. Weisman had hoped. While any such parallel dealer behavior taken alone might not suffice under *Theatre Enterprises,* it certainly can serve as partial circumstantial evidence of conspiracy when viewed together with the "invitation" and "facilitators" outlined above.

---

**23.** For a more detailed explanation of this point, see page 783 *infra.*

In summary, plaintiffs could establish evidence of: (1) dealer motivation to raise the starting price collectively, (2) an understanding that an effective raising of the starting price could in fact only be done collectively, (3) an invitation, in a collective setting, to raise the starting price, (4) mechanism for facilitating the collective acceptance of that invitation, and (5) subsequent action consistent with a collective acceptance of that invitation. If established, such evidence could allow a trier of fact to find concerted dealer action to raise the starting price within the principles of *Interstate Circuit*. Defendants proffer numerous depositions in which the various dealers assert that no concerted action of any kind occurred. However, this only crystallizes the factual issue which the Court cannot resolve on a summary judgment motion.[23A]

*The Weisman Defendants as Co-Conspirators*

The Weisman defendants stress their "vertical" relationship with the dealers.[24] While this may have some relevance in determining whether a case proceeds under a *per se* or Rule of Reason standard, it poses no barrier to the trier of fact on the threshold issue of concerted action between the dealers as a group and the Weisman defendants.

The traditional Supreme Court cases on "vertical" concerted action deal with the existence of a manufacturer/dealer combination for maintenance of the resale prices of the manufacturer's products.[25] In the seminal case, Justice McReynolds held that a manufacturer could announce the resale prices it wished its retailers to charge and then unilaterally refuse to sell to those retailers who did not adhere to his suggestions. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Later decisions refused to construe *Colgate*

as requiring that a finding of an actual "agreement" was a prerequisite for a price maintenance combination:

Thus, whatever uncertainty previously existed as to the scope of the *Colgate* doctrine, *Bausch & Lomb* and *Beech-Nut* plainly fashioned its dimensions as meaning no more than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible under the Sherman Act. In other words, an unlawful combination is not just such as arises from a price maintenance *agreement*, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.

*United States v. Parke, Davis & Co.*, 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). In *Parke, Davis*, the drug manufacturing company went beyond merely announcing that it would not deal with retailers who did not adhere to its suggested resale price schedule. Justice Brennan found that Parke, Davis also enlisted its wholesalers' assistance in enforcing the retailers' price schedules and approached individual retailers to "remind" them of its policy. Always telling each retailer that it was similarly warning the other retailers to adhere to its policy, Parke, Davis at one stage even served as a relay mechanism among dealers to transmit messages to the effect that "an individual dealer would adhere to the policy if the other dealers did." *Id.* 362 U.S. at 35–36, 80 S.Ct. at 507. Justice Brennan found the manufacturer to be not only a full participant in illegal concerted action but in fact the actual ringleader:

When the manufacturer's actions, as here, go beyond mere announcement of

---

**23A.** The Court reserves ruling on any dealer defendants who did not actually attend a meeting. Any such defendants may file new motions for summary judgment and the plaintiffs should make particularized responses.

**24.** As will be described *infra*, "vertical restraints" frequently occur among firms operat-

ing at different levels of the production and distribution chain of a given product.

**25.** Express contracts of minimum resale price maintenance violate § 1 under *Dr. Miles Medical Co. v. John D. Park & Sons, Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, he has *put together* a combination in violation of the Sherman Act... It must be admitted that a seller's announcement that he will not deal with customers who do not observe his policy may tend to engender confidence in each customer that if he complies his competitors will also. But if a manufacturer is unwilling to rely on individual self-interest to bring about general voluntary acquiescence which has the collateral effect of eliminating price competition, and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid such price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. The product then comes packaged in a competition-free wrapping—a valuable feature in itself— by virtue of concerted action induced by the manufacturer. *The manufacturer is thus the organizer of a price-maintenance combination* or conspiracy in violation of the Sherman Act. [emphasis supplied].

*Parke, Davis,* 362 U.S. at 44, 46–47, 80 S.Ct. at 512, 513. *Parke, Davis* indicates both: (1) that the organizer of a horizontal conspiracy may be liable as a co-conspirator even if the organizer was not one of the actual competitors and (2) that the organizer did not have to produce an actual intercompetitor agreement in order to be held to have provoked an illegal combination.

■ The subsequent Supreme Court decision of *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), established that co-conspirators do not have to have identical motives in order to conspire with each other. In other words, a plaintiff does not have to establish that the ultimate objective of each conspirator was the actual restraint of trade—it is sufficient if effectuation of the restraint is an intermediate goal sought for the facilitation of some other overriding objective. Thus, the Su-

preme Court has indicated that independent parties assisting a company in achieving its restraint can be co-conspirators with the company even though they will never be in a position to reap the benefits that directly flow from the restraints. *Albrecht,* 390 U.S. at 150, 88 S.Ct. at 872 (man hired by newspaper to solicit customers away from one of newspaper's delivery men); *Poller,* 368 U.S. at 470, 82 S.Ct. at 489 ("special agent" who received commission for facilitating condemned transaction). Lower courts, concerned about the *Albrecht's* potential to sweep mere "pawns" of large corporations within the reach of § 1,[26] have attempted to narrow its reach. *See, e.g., Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025, 1031–32 (2nd Cir.1979) (knowing and active participation in competitive scheme required); *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068, 1072–75 (3rd Cir.1978) (pawn's agreement must itself restrain trade). However, none of the Circuit Court decisions dislodge the fundamental import of *Albrecht* and require perfect symmetry of the co-conspirators' motivation. Immunization of the pawn "just doing his job" does not imply immunization of the intentional orchestrator of a restraint.

■ Moving to the instant facts, the Court finds that a genuine issue exists as to whether the Weisman defendants joined as co-conspirators in an interdealer combination to raise the starting price of 1980 Toyotas. A canvassing of the current record reveals potential evidence that:

1. Weisman strongly desired to have the dealers accept Polyglycoat accessories on the cars. He may have had an ultimate motivation of selling more sealants, selling more cars, or selling more of both.

2. Communications from the dealers before 1979 informed Weisman that competitive concerns prevented the dealers from acceding to Weisman's wishes.

---

**26.** Professor Areeda shares this concern over the inclusion of "pawns" as § 1 conspirators and queries whether the telephone company could be held to be a co-conspirator if competitors reached agreements on a restraint of trade over the telephone. Areeda, *supra,* at ¶ 528.

3. At meetings which Weisman attended, Abbott specifically informed the dealers of the very act—charging the starting price unless the customer balked—which if collectively pursued would violate § 1.

4. The Weisman defendants provided all of the previously discussed "facilitators": common meetings, galvanizing speeches, circulating sign up sheets, and vigorous individual followups.

It is hardly rank speculation to combine the above and infer that Weisman purposefully organized concerted dealer action to raise the starting price in order to give the dealers incentive to order Polyglycoat products. That Weisman's ultimate motivation was not to raise the starting price, and that raising the starting price may in fact have been somewhat inconsistent with the Harbridge House recommendations of reducing dealer profit per car,[27] perhaps weaken but do not eliminate this inference. One could review the prior dealer complaints filed with the national importer and the Maryland Motor Vehicle Administration and conclude that Weisman deliberately decided to accomplish by conspiracy what he could not accomplish by coercion. He was present, after all, when his employee repeatedly stressed the potential profits available from using the suggested price as the starting price. As the above authorities indicate, it is irrelevant that: (1) the Weisman defendants were not competitors of the dealers, (2) the Weisman defendants did not provoke actual express agreements and (3) the conspiracy was but a means to their end rather than the end itself.

## LIABILITY UNDER § 1: PER SE OR RULE OF REASON?

Application of a *per se* or Rule of Reason standard usually revolves around the characterization of a given transaction. In arguing for their respective positions, the parties apply distinctly different nomenclature to categorize the programs at issue. Plaintiffs contend the program constituted "classic horizontal price fixing" while defendants assert that they were mere "vertical non price restraints." Before specifically addressing these respective positions, the Court reviews the distinctions among "horizontal," "vertical," "price," and "non price" restraints.

*Review of The Authorities: The Horizontal/Vertical Distinction*

In economists' terms, "vertical" restraints are restraints among firms operating at different levels of the production and distribution chain of a product while "horizontal" restraints occur among firms competing on the same level of several production and distribution chains. In 1977, the Supreme Court ruled that all non price vertical restraints were governed by the Rule of Reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).[28] Justice Powell found a *per se* approach inappropriate because one could not say that non price vertical restraints lacked redeeming virtue. He observed: "The market impact of [non price] verticle restraints is complex because of their potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition."[29] *Id.* at 51–52, 97 S.Ct. at 2558. Specifically, "vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." *Id.* at 54, 97 S.Ct. at 2559.

After *Sylvania*, dispute has arisen over precisely what constitutes the legal defini-

---

27. The extent of this inconsistency revolves around the effectiveness of the Total Concept Program's "discount only if the customer balks" approach in approximating the sales results obtained if the dealer unilaterally reduced the price before the commencement of the customer negotiations.

28. An example of a non price vertical restraint is the "location clause" found in *Sylvania:* a term in a manufacturer-retailer franchise agreement prohibiting the retailer from selling franchised products from locations other than those specified in the agreement.

29. Implicit in much of the Supreme Court's reasoning in *Sylvania* is the eminently reasonable assumption that interbrand competition should be the true focus of the antitrust laws in a nonmonopolistic market.

tion of a "vertical" restraint, as the Supreme Court did not actually define the term itself. Courts have long condemned restrictions originating among the dealers but including the manufacturer as illegal *per se*. *See, e.g., United States v. General Motors,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 678 F.2d 742, 743 (7th Cir.1982) (Posner, J.). The *Sylvania* court specifically indicated that such arrangements remained both "horizontal" and illegal *per se*. *Sylvania,* 433 U.S. at 58, n. 28, 97 S.Ct. at 2561, n. 28. The Fifth Circuit of Appeals has seized upon this affirmance of the traditional rule that restraints originating among the dealers were illegal *per se* to assert the converse: restraints originating with the manufacturer are automatically "vertical" and subject to the Rule of Reason. *See, e.g., Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981); *H & B Equipment Co., Inc. v. International Harvester Co.,* 577 F.2d 239, 245–46 (5th Cir.1978); *cf. United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 372, 87 S.Ct. 1856, 1862, 18 L.Ed.2d 1249 (1967) (language intimating a "source" test). Based primarily upon the language of *Schwinn,* the Court has also followed the "source" rule and held that the potentially "horizontal" aspects of a restraint in which the manufacturer also competes with its distributors should be analyzed within the general Rule of Reason construct. *Donald B. Rice Tire Co., Inc. v. Michelin Tire Corp.,* 483 F.Supp. 750, 754 (D.Md.1980). However, the Fourth Circuit on appeal disagreed with the Court's invocation of the

source rule, stating "[w]e must reject, however, any implication arising from the district court's discussion of *Schwinn* that a restraint may always be regarded as vertical if it is imposed by the manufacturer." *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15, 16 (4th Cir.1981) (per curiam). The Fourth Circuit then implied that a "functional analysis" would be preferable, although it was willing within the facts of that particular case to accept the Court's Rule of Reason analysis as an effective surrogate for the "functional analysis" because the Court's Rule of Reason opinion "clearly indicated that the restraints were *for the purpose of promoting interbrand competition* [Emphasis supplied]." *Id.* at 16–17.

■ In light of the dictates of *Rice,*[30] the Court adopts a "functional analysis" for characterizing a restraint as "horizontal" or "vertical." Specifically, the Court follows the implications of *Rice* that a restraint is "vertical" if the purpose of the restraint is to promote interbrand competition. The Court amplifies the phrase "undertaken for the purpose of promoting interbrand competition" as encompassing any act which a supplier[31] takes for the purpose of maximizing his profit in the product being restrained. Such a definition fully incorporates all of the potentially pro competitive practices stressed by Justice Powell in *Sylvania.*[32] For example, acts designed to achieve distributional efficiencies automatically qualify, as they are directed towards profit maximization by attempting to re-

**30.** Defendants urge the Court to disregard the *dicta* of the Fourth Circuit in *Rice* as poorly reasoned and inconsistent with *Sylvania,* 433 U.S. at 36, 97 S.Ct. at 2549. However, the Court will not ignore the explicit directions of its reviewing tribunal, even if the comments of that tribunal were not inevitably required by the decision. Furthermore, the Court regards the "functional analysis" adopted in the present case as fully consistent with and logically implied by *Sylvania.*

**31.** For purposes of convenience, the Court employs the term "supplier" to designate the entity on which is higher on the distribution scale

than its co-conspirators, whether that entity be a manufacturer or, as here, a distributor.

**32.** As the Third Circuit observed in construing *Sylvania,* "When a manufacturer acts on its own, *pursuing its own market strategy,* it is seeking to compete with other manufacturers by imposing what may be defined as reasonable vertical restraints. This would appear to be the rationale of the *GTE Sylvania* decision [emphasis added]." *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 167 (3rd Cir.1979). The Court's definition would encompass any act related to a supplier "pursuing its own market strategy" in a product.

duce costs.[33] Profit maximization in that product need not be the exclusive purpose of the supplier; a court cannot say with assurance that a practice lacks all redeeming virtue if even one of its purposes is to maximize the supplier's profits in the product being restrained. *Cf. Northern Pacific,* 356 U.S. at 5, 78 S.Ct. at 518 (*per se* practice must lack *any* redeeming virtue). Hence, the Court adopts what might best be described as a "qualified source rule:" a practice is "vertical" if its source was at least partially the supplier's drive for profits in the product concerned.[34]

*Review of The Authorities: The Definition of Price Fixing*

All parties acknowledge the *per se* illegality of price fixing. *See, e.g., Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). However, counsel have argued at length over what transactions may be categorized as "price fixing." Defendants contend that only those agreements which "on their face apply to price terms" qualify as price fixing. Envisioning a broader definition, plaintiffs assert that price fixing also encompasses those restraints which do not apply to price terms on their face but which nevertheless have the "purpose and effect" of raising prices. In light of the Court's determination that sufficient circumstantial evidence exists to raise a genuine issue about a tacit agreement among defendants to raise the starting price, this debate becomes superfluous, as plaintiffs would be alleging a restraint which *does* apply to price terms on its face.[35] Hence, the Court

**33.** The definition also *encompasses* certain categories of cases which defendants argue would be in effect overruled by a variation from the source rule. For example, defendants point to those cases where the manufacturer initiating a restraint also competes with his distributors at the distribution level. *See, e.g., H & B Equipment Co. v. International Harvestor Co.,* 577 F.2d 239 (5th Cir.1978). Such decisions uniformly retain a "vertical" characterization of the restraint. *Id.* However, these decisions are fully consistent with the Court's formulation: a manufacturer acting to maximize profits by a restriction of intrabrand competition in the distribution of his product is still attempting to maximize his profits from that product. A manufacturer might believe that greater efficiencies could be obtained by distributing more of his product directly; hence a court may not condemn out of hand a manufacturer's attempts to ensure that he retains certain distributional advantages for himself.

Similarly, defendants' concern that a variation from a rigid source rule would "eliminate tying doctrine" is also misplaced. While the Court's definition if rigorously applied would characterize a manufacturer-dealer "tie" as "horizontal" (since the manufacturer's acts with regard to the "tying" product are motivated by a desire for profits in the "tied" product), such a characterization has relevance only on the level of abstract theory. The "horizontal"/"vertical" distinction has traditionally been made only in the areas of mergers and "restricted distribution" arrangements; tying constitutes a completely separate category of antitrust law with its own specific rules.

**34.** Additional support of this formulation may be found in the reasoning of those courts upholding the traditional *per se* treatment of re-

straints originating among the dealers. *See, e.g., Cernuto,* 595 F.2d at 168. The Third Circuit observed there: "... both the purpose and effect of ... [the particular dealer-instigated restraint] was to eliminate competition at the retail level and not as in *GTE Sylvania,* to promote competition at the manufacturing level. Accordingly, the pro competitive virtues so critical in *GTE Sylvania* may not be presented here." *Id.* The definition adopted here would carry this rationale to its logical conclusion and exclude from "vertical" characterization all those practices not directed at "promoting competition at the manufacturers level" and hence lacking "the pro competitive virtues so critical in *GTE Sylvania.*"

**35.** If plaintiffs proceed with an alternative theory that the defendants "conspired to order collectively all of their cars with the protective package with the purpose and effect of raising the starting price," then the issue will have to be addressed. At this stage, it appears that horizontal restraints with the purpose and effect of raising prices are *per se* illegal, *see, e.g., Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980); *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940), but also that blind application of the "purpose and effect" doctrine in the vertical context would eviscerate settled Supreme Court doctrine in such areas as restricted distribution, *Sylvania,* 433 U.S. at 56, 97 S.Ct. at 2560, and tying, *United States Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). However, the Court avoids any definitive exposition unless the parties subsequently make an actual decision necessary.

will canvass the authorities without specific reference to this interesting but now irrelevant issue.

Stemming from Justice Douglas' opinion in *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), the traditional definition of quite price fixing is quite broad, as recently reaffirmed by the Fourth Circuit:

> price fixing is one of those practices that the Court has held to be illegal per se under the Sherman Act. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The Court stated at 223, 60 S.Ct. at 844 [sic] "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se." To be guilty of price fixing, the conspirators do not have to adopt a rigid price, substantially less has been found to be price fixing. An activity can violate the per se rule even if its effect upon prices is indirect. *United States v. General Motors,* 384 U.S. 127, 147, 86 S.Ct. 1321, 1331, 16 L.Ed.2d 415 (1966). In essence, an interference with the market forces freely setting the prices of goods is sufficient. *In Re Yarn Processing Patent Validity Litigation,* 541 F.2d 1127, 1137 (5th Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2976, 53 L.Ed.2d 1094 (1977).

*National Electrical Contractors Association, Inc. v. National Constructors Association,*

678 F.2d 492, 500 (4th Cir.1982). The continuing vitality of *Socony* as the leading case on price fixing is indicated by the great reliance the Supreme Court placed on *Socony* in its two most recent price fixing decisions. *Maricopa,* 102 S.Ct. at 2473–74; *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980). Given the breadth of *Socony,* it is indeed not surprising that courts have categorized a wide variety of practices as price fixing. The Fourth Circuit recently summarized a sampling of those varied practices:

> *Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), elimination of interest free short term credit; *United States v. Container Corp. of America,* 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969), exchange of price information as stabilizing although lowering prices; *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), setting minimum prices; *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 21, 71 S.Ct. 259, 95 L.Ed. 219 (1951), setting maximum prices; *United States v. Socony-Vacuum Oil,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), buying surplus gasoline to stabilize prices; *Plymouth Dealers Assoc. of Northern Cal. v. United States,* 279 F.2d 128 (9th Cir.1960), establishing price list from which negotiations began.

*National Electrical Contractors,* 678 F.2d at 500, n. 12.[36]

---

**36.** Defendants understandably rely on *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), in arguing that a narrower scope is appropriate for price fixing doctrine. *Broadcast Music* asserts that a particular practice may not be condemned as price fixing, even if it "literally" sets prices, unless prior experience has convinced a court that that particular practice is plainly anticompetitive and very likely without redeeming virtue. *Broadcast Music,* 441 U.S. at 9–10, 99 S.Ct. at 1556–57. If the Supreme Court's pronouncement is itself taken "literally," then *Socony* and its progeny are effectively eliminated. Almost any able antitrust defense attorney would be able to characterize the particular actions of his clients as "unique" or "unfamiliar," thereby plunging a court into the very detailed competitive analy-

sis that *per se* rules were designed to avoid. Perhaps recognizing the severe practical effects of *Broadcast Music,* the Supreme Court has not seen fit to follow the literal implications of the opinion in its subsequent price fixing decisions. *Maricopa,* 102 S.Ct. at 2468, *Catalano,* 446 U.S. at 643, 100 S.Ct. at 1925. In particular, the *Maricopa* court condemned as illegal *per se* a very complicated and innovative health care plan allegedly designed to reduce health care costs. Justice Powell in dissent strongly argued that this innovative arrangement presented just the sort of "novel" practice to which "the *per se* label should not be assigned without carefully considering substantial benefits and pro competitive justifications." *Maricopa,* 102 S.Ct. at 2483–84 (Powell, J., dissenting). Justice Powell later concluded that "[t]he court's effort to distinguish *Broadcast Music*

In particular, as noted by the Fourth Circuit in the above quotation, an agreement among competitors on the starting price to be used in commencing negotiations with their customers falls within the forbidden category. *Plymouth Dealer's Association of Northern California v. United States,* 279 F.2d 128 (9th Cir.1960); *Theophil v. Sheller-Globe Corp.,* 446 F.Supp. 131 (E.D.N.Y. 1978). The Ninth Circuit observed:

> The test is not what the actual effect is on prices, but whether such agreements interfere with "the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons,* supra, 340 U.S. at page 213, 71 S.Ct. at page 260. The competition between the Plymouth dealers and the fact that the dealers used the fixed uniform list price in most instances only as a starting point, is of no consequence. It *was* an agreed starting point; it had been agreed upon between competitors; it was

in some instances in the record respected and followed; it had to do with, and had its effect upon, price.

The fact that there existed competition of other kinds between the various Plymouth dealers, or that they cut prices in bidding against each other, is irrelevant. *Plymouth Dealers,* 279 F.2d at 132.[37]

■ The presence of a "vertical" element in a price restraint does not immunize it from *per se* status. Both minimum resale price maintenance, *Parke, Davis,* 362 U.S. at 47, 80 S.Ct. at 513; *cf. Dr. Miles Medical Company v. John D. Parks & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) (seminal decision antedating *per se* doctrine and declaring minimum resale price maintenance contracts unlawful), and maximum resale price maintenance, *Albrecht,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 are illegal *per se.* These decisions have come under severe scholarly criticism,[38] but Justice Powell specifically reaffirmed the *per se* illegality of vertical price restraints in *Syl-*

---

thus is unconvincing." *Id.* Given this apparent retreat from *Broadcast Music,* the Court has no alternative but to follow the traditional *Socony-Maricopa* line of cases until the Supreme Court clearly indicates the contrary.

**37.** A copiously annotated opinion by the United States District Court for the Southern District of New York provides further indication as to why an agreement to raise the starting price is properly within the reach of *Socony. Checker Motor Corp. v. Chrysler Corp.,* 283 F.Supp. 876 (S.D.N.Y.1968) (Mansfield, J.). In *Checker,* the plaintiff taxicab manufacturing company alleged that its manufacturing competitor Chrysler had conspired with Chrysler dealers to fix the retail price of Chrysler taxis. The sole basis for this allegation was Chrysler's policy of providing direct rebates from Chrysler itself to purchasers of Chrysler's taxis. Denying plaintiff's motion for summary judgment, Judge Mansfield distinguished *Plymouth Dealers* and stated:

> Regardless of the absence of agreement as to a specific or uniform price, a wide variety of horizontal and vertical arrangements have been classified as price-fixing agreements and therefore condemned as unlawful *per se, e.g.* ..., *Plymouth Dealers Assn. of Northern Cal. v. United States,* 279 F.2d 128 (9th Cir. 1960) (agreements on starting price for bargaining and trade-in allowances). However, an essential element is the competitor's surrender, express or implied, of some measure

of pricing discretion. The evil of price-fixing agreements is that they

> "cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." (*Kiefer-Stewart Co. v. Joseph Seagram & Sons, Inc.,* 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219 (1951)).

Conduct or agreements not restricting a competitor's price independence, on the other hand, falls [sic] short of illegal price fixing... Thus, there is a failure to show any provision of the plan, or any facts, indicating that the plan would tend to affect the exercise of competitive pricing discretion, or to affect or tamper with the range, level, scale, or amount of the price paid for Chrysler taxicabs, such as appears in price-fixing or distribution agreements that have been struck down as unreasonable without more. In the absence of proof that the Rebate Plan has a tendency to restrict the dealer's pricing independence, or has some pricing effect, it amounts to nothing more than a promotional device which cannot be labelled illegal *per se. Id.* at 882–83. A starting price conspiracy, on the other hand, does contain a "surrender, express or implied, of some measure of pricing discretion," and properly qualifies for *per se* treatment.

**38.** *Albrecht* has fared particularly poorly in the eyes of learned commentators. *See, e.g.,* Areeda, *supra,* at ¶ 506.

*vania,* 433 U.S. at 51, n. 18, 97 S.Ct. at 2558, n. 18. *Cf. Maricopa,* 102 S.Ct. at 2474–75 (*quoting* from *Albrecht* in condemning maximum price fixing). The presence of a manufacturer in a scheme to raise the starting price of motor homes did not alter its *per se* status in *Theophil,* 446 F.Supp. at 131, and the Court perceives no judicial, as opposed to scholarly, authority to do so here.

*Application of The Authorities: The Total Concept Program*

Plaintiffs assert that the Weisman defendants initiated the restraint at issue in order to raise the suggested/starting price of 1980 Toyotas and thereby enhance the possibility for substantial "discounting" or "packing." Plaintiffs in fact repeatedly assert that the Weisman defendants sought to sell more Toyotas. Under the Court's "qualified source rule," such a theory of the case would clearly establish a vertical restriction. Indeed, plaintiffs may only establish a horizontal restriction if they successfully prove that the Weisman defendants' exclusive motivation was to sell more Polyglycoat products. Only then could it be said that the Weisman defendants' acts had no relation to Toyota profit maximization and hence no potential for enchancing interbrand competition in Toyotas.

■ However, regardless of the classification of the Total Concept Program as "horizontal" or "vertical," its potential price fixing implications will not permit the Court to rule as a matter of law that its legality will be determined solely under a Rule of Reason standard. As previously described, a genuine issue exists as to whether or not the defendants entered into a tacit agreement to raise the starting price of the 1980 Toyotas. If the jury in fact finds that such an agreement occurred, then the concerted action clearly qualifies as price fixing illegal *per se* under *Plymouth Dealers,* 279 F.2d at 128 and *Theophil,* 446 F.Supp. at 131. *Parke, Davis,* 362 U.S. at 47, 80 S.Ct. at 513, and *Albrecht,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998, indicate that any "vertical" aspect of the Total Concept Program will not alter this result.

The existence of the Monroney Act, while certainly removing MAT's setting of the suggested retail price from antitrust scrutiny, in no way immunizes any of the defendants from the consequences of an agreement to utilize the suggested price as an actual starting point in negotiations. ". . . [T]here is a plain distinction between the lawful right to publish prices and terms of sale on the one hand, and an agreement among competitors limiting action with respect to the published prices, on the other." *Catalano,* 446 U.S. at 649–50, 100 S.Ct. at 1929. *Cf. Sugar Institute v. United States,* 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936) (agreement to adhere to previously announced prices held unlawful). In *dicta,* the *Plymouth Dealers* court specifically applied this distinction to the potential impact of the Monroney Act:

> Suffice it to say that it is one thing for Congress to say each manufacturer must, acting alone, set a suggested retail list price for his product, and another thing to say that competing dealers may so agree. Many unilateral acts are completely lawful but become violative of antitrust law when performed pursuant to an agreement between competitors. Further, the purpose of the Monroney Bill was to prevent misbranding, abuse of caravan car prices and the "packing" which were appellant's primary objective here.

*Plymouth Dealers,* 279 F.2d at 134. In summary, plaintiffs will have established a *per se* violation of the Sherman Act if they prove that the defendants tacitly agreed to raise the starting price of 1980 Toyotas through the facilitating mechanism of the Total Concept Program.

*The Authorities Applied: The Double Value Days Program*

■ The status of the Double Value Days Program requires far less elaboration. It was manifestly a program initiated by the Weisman defendants in order to deepen their penetration into the regional Toyota market by increasing "discounting." As

such, it is a classic vertical restraint. However, as it involves explicit contracts between a manufacturer and its dealers about lowering the resale price of the manufacturer's product, it is also a form of maximum vertical price fixing arrangement illegal *per se* under *Albrecht,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998. The Court acknowledges the trenchant economic critiques of *Albrecht,* but as a lower federal court has no authority to effectuate them.[39]

## CAUSE OF ACTION UNDER §§ 15, 15c: "INJURY SUSTAINED"?

As mentioned earlier, both the *parens patriae* and private action statutes require that a plaintiff demonstrate "injury." The *parens patriae* statute is of quite recent origin and has been construed by relatively few decisions. However, since Congress enacted the *parens patriae* statute in response to *State of Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), a Supreme Court decision prohibiting *parens patriae* suits from being brought under the private action statute, *see* 15 J. von Kalinowski, *Antitrust Laws and Trade Regulations* § 115.05[1] at 115–43, n. 2 (1982), the Court assumes in the absence of Congressional language to the contrary that Congress intended for *parens* actions largely to parallel treble damage suits. Hence, the Court combines the issues of "injury" under the respective statutes and accepts decisions construing the private action "injury" requirement as authoritative on the parameters of *parens* "injury" as well.

The private antitrust action requires significantly more than mere proof of a substantive violation of the antitrust laws:

> there are three essential elements in every private anti-trust action: They are (1) a violation of the antitrust law, (2) direct injury to the plaintiff from such violations, and (3) damages sustained by the plaintiff. It follows, therefore, that a mere finding of violation does not result in liability. The statute gives a right of action only to the extent that one has been "injured in his business or property by reason of anything forbidden in the anti-trust laws." The gravamen of the complaint is not the conspiracy; the crux of the action is injury, individual injury.

*Windham v. American Brands,* 565 F.2d 59, 65–66 (4th Cir.1977). In addition, "[p]laintiffs must prove antitrust injury, which is to say injury of the type of antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701. *Accord J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 561, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). However, once plaintiff has proven that some antitrust injury did in fact occur, the courts impose a much lighter burden upon him in establishing the precise extent of his damages. *Story Parchment Co. v. Paterson Co.,* 282 U.S. 555, 562–63, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931); *Montreal Trading Ltd. v. Amax, Inc.,* 661 F.2d 864, 867, n. 1 (10th Cir.1981); *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 858 (5th Cir.1981); *cf. J. Truett,* 451 U.S. at

---

**39.** In another case involving the application of the same protective package to 1980 (and 1979) Toyotas, the United States District Court for the Northern District of Alabama has ruled that the legality of alleged restraints initiated by the Toyota distributor for the southeastern United States would be tried under a Rule of Reason standard. *Moore v. Southeast Toyota Distributors, Inc.,* Civil 81–P–0491–S (N.D.Ala. June 22, 1982). As the *Moore* court provided no memorandum along with its order, one cannot ascertain what authorities Judge Pointer relied upon in reaching his decision. In addition, the precise restraint Judge Pointer was reviewing and its potential similarity to the present facts

remain unclear. In a previous order denying class certification, Judge Pointer indicated that the Toyota distributor for a significant period of time had actually discounted the entire price of the protective package *on* the Monroney sticker. *Moore v. Southeast Toyota Distributors,* 1982–2 Trade Cas. ¶ 64,743 (N.D.Ala. 1982). Besides causing no harm to the consumer, *see infra,* such an act without more appears to support an inference of unilateral distributor behavior beyond the scope of § 1. Given such significant factual variances, the Court does not believe that *Moore* permits it to part company with the authorities reviewed above.

567, n. 5, 101 S.Ct. at 1930, n. 5 (recognizing distinction). While damages may not be the result of mere guesswork or speculation, *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250; *but cf. Malcolm,* 642 F.2d at 858 ("proof of losses which border on the speculative is allowed"); *Jewel Tea Co. v. Local Unions,* 274 F.2d 217, 224 (7th Cir.1960) (speculation as to amount of damages won't prevent recovery once fact of actual damages proven), quite relaxed standards govern, *see generally Malcolm,* 642 F.2d at 858 (detailed listing of various damage rules). The rationale for this relaxation includes the inherent complexity and imprecision in calculating antitrust damages, *J. Truett,* 451 U.S. at 566, 101 S.Ct. at 1929; *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), and above all the inequity of allowing the defendant to profit from the uncertainty created by his own wrongdoing, *J. Truett,* 451 U.S. at 566–69, 101 S.Ct. at 1929–31; *Bigelow,* 327 U.S. at 264–66, 66 S.Ct. at 579–80; *Story Parchment,* 282 U.S. at 563, 51 S.Ct. at 250. In particular, courts appear to be loathe to entertain defendants' pleas about the speculative nature of determining the free market conditions which would have prevailed in the absence of a restraint when the defendant's own conduct has eliminated those free market conditions. *Id.*

■ In a price fixing case, the essential inquiry after liability has been established is the amount of any overcharge created by the defendant's conduct. *Chattanooga Foundry and Pipe Works v. City of Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906) (Holmes, J.); *State of Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891 n. 14, 31 L.Ed.2d 184 (1972) (*dicta*); *Ohio Valley Electric Corp. v. General Electric Co.,* 244 F.Supp. 914, 933 (S.D.N.Y.1965). "[Injury] and damages are coextensive; the overcharge constitutes the plaintiff's injury (impact) as well as the measure of his damage (damages) and is the difference between the price actually paid and the price he would

have paid absent the conspiracy." *Ohio Valley,* 244 F.Supp. at 933. In addition, Congress has provided *parens patriae* plaintiffs with a significant easing of their evidentiary burden in price fixing cases by eliminating the necessity for proof of individual damage:

> In any action under section 15c(a)(1) of this title, in which there has been a determination that a defendant agreed to fix prices in violation of the sections 1 to 7 of this title, damages may be proved and assessed in the aggregate by statistical or sampling methods, by the computation of illegal overcharges, or by such other reasonable system of estimating aggregate damages as the court in its discretion may permit without the necessity of separately proving the individual claim of, or amount of damage to, persons on whose behalf the suit was brought.

15 U.S.C. § 15d (1976).

The above authorities may be readily applied to the present facts. If the Total Concept Program did in fact involve a price fixing combination, then each individual Toyota consumer was "overcharged" by the difference between (1) the amount he actually paid for the 1980 Toyotas with the protective package and (2) the amount he would have paid for the 1980 Toyota with the protective package if the dealers had not agreed to raise the starting price. This "overcharge" varies with the individual purchaser. If the purchaser bargained the dealer down from the full $533.00, then the purchaser's individual overcharge was correspondingly reduced. If, on the other hand, the purchaser bought at the full $533.00 and the dealer would have unilaterally discounted the $533.00 suggested price down to the $113.00 cost in the absence of the conspiracy to raise the starting price, then the purchaser suffered an overcharge of $420.00. Obviously may other potential scenarios exist.

■ The summation of these overcharges represents the transfer of wealth from consumers to sellers as a result of the sellers' interference with the free workings of

the marketplace and constitutes the quintessential "antitrust injury." While plaintiffs' proof of "injury in fact" and "extent of injury" must await trial, they certainly have alleged actual injury. The Court cannot assume that all defendants' pricing behavior would have remained precisely the same in the absence of their concerted action, for such an assumption would ignore the very economic tenets of free market behavior which underlie our antitrust laws.[40]

On the other hand, the record clearly establishes that the Double Value Days Program by its very terms inflicted no injury upon the consumer. The program required the dealer to discount the entire suggested list price for the protective package from the starting price of the car and essentially gave the consumer something for nothing. The Court cannot assume that a car was physically worse off with the protective package than without it.[41]

For the foregoing reasons, it is this day of April, 1983, by the United States District Court for the District of Maryland, ORDERED:

1. That defendants' motions for partial summary judgment on the Double Value Days Program BE, and the same ARE, hereby GRANTED;

2. That the remainder of defendants' motions for summary judgment BE, and the same ARE, hereby DENIED;

3. That the rulings of law made herein shall govern the remainder of this action; and

4. That plaintiffs have leave to amend their pleadings to bring them into conformity with the rulings herein.

**40.** Defendants argue that plaintiffs must show that each consumer was "coerced" into buying the protective package in order to establish injury. However, the consumers' injury arises not from an "unwanted" purchase of the Toyota with the protective package but in paying more for the Toyota with the protective package than they would have paid for the Toyota with the protective package in the absence of the conspiracy. Defendants contend that the fact that the purchaser received something of at least some value as part of the transaction is

being ignored, but the Court explicitly incorporates this inherent "off-set" into the damage formula.

**41.** Plaintiffs claim that they do not know for certain that the dealers actually adhered to their end of the deal and unilaterally discounted the suggested price. However, to the extent this occurred, it would indicate that the consumer was "injured" not as a result of any concerted action but because the dealer/distributor contract was *breached.*